1       UNITED STATES DISTRICT COURT
2        DISTRICT OF PUERTO RICO

3   COMMONWEALTH OF PUERTO RICO,
4
5        Plaintiff,                    Civil No. 06-1305 (JAF)

6        v.                            Consolidated With:

7   UNITED STATES OF AMERICA,          Civil No. 06-1306 (JAF)
8   et al.,
                                       Related To:
9        Defendants.
                                       Misc. No. 06-049 (JAF)


10                        **OPINION AND ORDER**

11                              **I.**

12                           **Background**

13       Plaintiff, the Commonwealth of Puerto Rico, brings this action

14   against the following Defendants: (1) the United States of America;

15   (2) Alberto R. Gonzales, in his official capacity as the United

16   States Attorney General; (3) Robert Mueller, in his official capacity

17   as the Director of the Federal Bureau of Investigations (FBI);

18   (4) Rosa Emilia Rodríguez-Vélez, in her capacity as the United States

19   Attorney for the District of Puerto Rico;[1] and (5) Luis S. Fraticelli,

20   in his official capacity as Special Agent in Charge of the FBI in

21   Puerto Rico, asking this court: (a) to declare Defendants' refusal to

22   disclose Department of Justice (DOJ) agency records pertaining to two

---

[1]Humberto S. García originally appeared in the caption of this case, and will be referred to throughout, as the United States Attorney for the District of Puerto Rico.  He retired, however, and has been succeeded by Rodríguez.

Civ. No. 06-1305 (JAF)                                                    -2-

1    controversial FBI operations as violative of the housekeeping

2    statute, 5 U.S.C. § 301 (1996 & Supp. 2006), regulations promulgated

3    by DOJ pursuant to the housekeeping statute, 28 C.F.R.

4    §§ 16.21-16.29, and its sovereign right to pass and enforce criminal

5    laws as established in the United States Constitution; and (b) to

6    permanently enjoin Defendants from withholding any information that

7    Plaintiff requests pertaining to two FBI operations. Docket Document

8    No. 1; Civ. No. 06-1306, Docket Document No. 1. Defendants move to

9    dismiss Plaintiff's complaint, arguing that Plaintiff fails to state

10   claims upon which relief can be granted because the federal

11   government has properly invoked a privilege recognized by the

12   housekeeping statute and related DOJ regulations that protect agency

13   records from disclosure when their release would reveal sensitive law

14   enforcement investigative techniques. Docket Document Nos. 23, 25.

15   Plaintiff opposes Defendants' motion, Docket Document No. 29, and

16   moves for summary judgment in its favor. Docket Document No. 30.

17   Defendants oppose Plaintiff's summary judgment motion, Docket

18   Document No. 32, and reply to Plaintiff's opposition to their motion

19   to dismiss. Docket Document No. 35.

20       Plaintiff's complaint is divided into five causes of action.

21   Docket Document No. 1; Civ. No. 06-1306, Docket Document No. 1. We

22   grant Defendants' motion to dismiss as to Plaintiff's first four

23   causes of action which, inter alia, challenge the constitutionality

24   of the housekeeping statute and related DOJ regulations, question

Civ. No. 06-1305 (JAF)                                                     -3-

1    whether these laws recognize the law enforcement investigative
2    technique privilege at all, and suggest that it is entitled to non-
3    statutory judicial review of Defendants' decision to invoke the
4    investigative techniques privilege.  Docket Document No. 1; Civ.
5    No. 06-1306, Docket Document No. 1; See, infra, sections IV.A, IV.B,
6    IV.C.  As to Plaintiff's fifth and final cause of action, which asks
7    for judicial review of whether Defendants have correctly invoked the
8    investigative techniques privilege to protect the records requested
9    in this case under the Administrative Procedure Act (APA), 5 U.S.C.
10   §§ 551 et seq. (1996 & Supp. 2006), we also dismiss this, granting
11   summary judgment in Defendants' favor.  Docket Document No. 1; Civ.
12   No. 06-1306, Docket Document No. 1, See, infra, section IV.D.

**II.**

**Factual and Procedural Synopsis**

15        This case concerns two information requests Plaintiff made of
16   the federal government, and Defendants' refusal to disclose all of
17   the requested records.  This factual summary is derived from the case
18   records pertaining to two complaints filed by Plaintiff on March 23,
19   2006, one for each of the denied information requests.  Docket
20   Document Nos. 1, 11, 23, 25, 26, 29, 30, 35, 37, 38.  Though these
21   two complaints were originally assigned individual case numbers, they
22   were consolidated under Civ. No. 06-1305 on March 24, 2006, because
23   they presented near-identical legal issues. Civ. No. 06-1306, Docket
24   Document No. 7.

Civ. No. 06-1305 (JAF)                                                    -4-

1    **A.    Ojeda Information Requests**

2        We gather the following factual background from papers and

3    documents on file, as well as from the DOJ's Inspector General's

4    Report on the Ojeda raid. <u>See</u> U.S. DOJ, Office of the Inspector

5    General, A Review of the September 2005 Shooting Incident Involving

6    the FBI and Filiberto Ojeda Ríos, August. 6, 2006, Available at:

7    http://www.usdoj.gov/oig/special/s0608/full_report.pdf. The parties

8    have referred to this document in their filings.  <u>Docket Document</u>

9    <u>Nos. 37, 38</u>.  By making this statement of facts we do not claim that

10   these facts are beyond controversy or that they have been

11   definitively established.

12       Filiberto Ojeda-Ríos helped found the Macheteros, an

13   organization that seeks to gain Puerto Rico's independence by armed

14   struggle against the United States government, in the mid-1970s.  In

15   the years that followed, the Macheteros claimed responsibility for

16   various murders and bombings around the island, and have conducted

17   robberies to finance their activities. One such robbery occurred on

18   September 12, 1983, when the Macheteros stole $7.1 Million from a

19   Wells Fargo facility in West Hartford, Connecticut; the theft was one

20   of the largest bank robberies in U.S. history.

21       On August 30, 1985, while executing a warrant to arrest Ojeda in

22   Puerto Rico, FBI agents received no response when they announced

23   themselves at Ojeda's residence. Once the agents entered, however,

24   Ojeda opened fire and shot one of the federal agents in the face,

Civ. No. 06-1305 (JAF)                                                    -5-

permanently blinding him in one eye. After a standoff, Ojeda was
subdued by agents.  Ojeda was first put on trial in Puerto Rico for
assaulting the FBI agents during the arrest, and was acquitted.
While out on bond pending final disposition and sentence in
Connecticut for the bank robbery, Ojeda cut off his electronic
monitoring device and skipped bail.  Ojeda was sentenced for the
bank robbery charge in Connecticut in 1992 in absentia.

Nearly fifteen years later, FBI intelligence revealed that Ojeda
was living in Hormigueros, Puerto Rico, and the agency began an
operation on or around September 23, 2006, to apprehend him.  In the
course of the FBI's raid of his estate, Ojeda opened fire and shot an
agent in his abdomen.  Another agent was also shot, but ultimately
escaped injury because of his bullet-proof vest.  Ojeda himself was
shot.  On orders from superiors in Washington, D.C., however, FBI
agents did not enter the Ojeda residence until the next day, by which
time Ojeda had died from his injury.

Puerto Rico DOJ ("PRDOJ") almost immediately began an
investigation into the Ojeda raid, and to that end, on October 4,
2005, Defendant Fraticelli was served with a subpoena for the
production of related information and objects. Michael Faries, Chief
Division Counsel with the FBI in Puerto Rico, responded by letter to
Pedro G. Goyco-Amador, Prosecutor General of the Commonwealth, on
October 5, 2005, reminding him that DOJ regulations, 28 C.F.R.
§§ 16.21-16.29, laid out specific requirements and procedures for

1    requesting agency records.  This regulatory framework, according to

2    Faries, required Goyco to "furnish an affidavit or statement to the

3    United States Attorney's Office, District of Puerto Rico," setting

4    forth a summary of "the particular documents or testimony requested

5    and their relevance to the proceedings" for which they are needed.

6         On October 7, 2005, Puerto Rico Attorney General Roberto J.

7    Sánchez-Ramos sent the necessary affidavit to United States Attorney

8    Humberto S. García in order to complete the Commonwealth's

9    information request.  In all, PRDOJ requested that the FBI produce

10   twenty-three categories of information and materials.  Among the

11   items the PRDOJ demanded were:  (1) a copy of the "Operation Order"

12   relating to the FBI raid on Ojeda's residence; (2) the name, rank,

13   division, address, and telephone number of every person who

14   participated in, knew of, or took any decision regarding the

15   operation; (3) nearly all equipment, vehicles, and weapons involved

16   in the raid; (4) information gathered during the FBI's occupation of

17   Ojeda's property; (5) copies of expert reports, photographs, video

18   and audio recordings relating to the FBI's raid; and (6) general

19   protocols for violent and arrest interventions.

20        On October 17, 2005, García responded by letter to Sánchez that

21   the FBI would not surrender any of the information, objects, and

22   documents sought by the subpoenas, noting that DOJ regulations

23   precluded disclosure when it "would reveal investigatory records

24   compiled for law enforcement purposes, and would interfere with

1    enforcement proceedings or disclose investigative techniques and

2    procedures the effectiveness of which would thereby be impaired." 28

3    C.F.R. § 16.26(b)(5)   This, García wrote, was a "final agency

4    decision which may be reviewed by the United States District Court."

5        In subsequent communications between García and Sánchez,

6    however, García urged Sánchez not to worry that the FBI's decision

7    necessarily rendered the requested objects and information

8    undiscloseable in perpetuity.  There were some items, for instance,

9    García wrote in an October 21, 2005, letter to Sánchez, that could

10   possibly be released "once [an investigation by the DOJ Office of the

11   Inspector General] as well as other investigations are completed."

12       In response to the FBI's refusal to immediately produce

13   information and objects, PRDOJ threatened judicial action in a letter

14   dated November 2, 2005.

15       García wrote Sánchez again on November 9, 2005, indicating his

16   frustration with PRDOJ's impatience.  In that letter, though, García

17   consented to permit PRDOJ access to examine certain items listed in

18   its subpoena, including:  (1) the bullet proof vests and helmets

19   damaged during the intervention; (2) the weapons fired in the

20   intervention; (3) the vehicle used to enter Ojeda's residence; and

21   (4) the photographs taken before, during, and after the intervention.

22   García conditioned Plaintiff's access to these items, however, on an

23   FBI official's presence during inspection.  García further insisted

24   that the FBI would at all times retain official custody of the items

Civ. No. 06-1305 (JAF)                                              -8-

1    and PRDOJ would have to share its conclusions with the Office of the

2    Inspector General (OIG).  As to the remaining items listed in the

3    subpoena, García insisted that they remained undiscloseable.  In the

4    event that his attempts to compromise were insufficient, García

5    reminded Plaintiff that the APA provided an opportunity for judicial

6    review of the agency's decision.

7         Plaintiff accepted García's invitation to examine the vests,

8    helmets, weapons, vehicle, and photographs.  On January 20, 2006,

9    however, Plaintiff issued another angry letter to García requesting

10   that he produce additional agency records – contact information for

11   "those individuals who can shed the most light into the chronology

12   and nature of the events that transpired on the field during the

13   intervention with Mr. Ojeda Ríos, as well as regarding the key

14   decisions concerning the manner and conduct of said intervention" –

15   within one week, by January 27, 2006.  On January 26, 2006, García

16   sent Plaintiff a letter refusing this demand, referencing the

17   agency's earlier and oft-repeated invocations of 28 C.F.R.

18   § 16.26(b)(5).

19        Plaintiff filed a lawsuit in this court on March 23, 2006,

20   seeking declaratory and injunctive relief from Defendants' refusal to

21   release the requested records.  <u>Civ. No. 06-1305, Docket Document</u>

22   <u>No. 1</u>.

23   **B.   <u>444 De Diego Information Requests</u>**

1      In  the  aftermath  of  the  Ojeda  raid,  FBI  agents  retrieved

2   information from his residence which was, in turn, used by the agency

3   to help establish the probable cause necessary to obtain additional

4   search warrants relating to their investigation of several specific

5   criminal activities being planned by the Macheteros.  As FBI agents

6   executed  one  of  these  search  warrants  at  a  residential  condominium

7   located at 444 de Diego, in the Río Piedras area of San Juan, Puerto

8   Rico, on February 10, 2006, a large group of protesters, reporters,

9   and  curious  members  of  the  general  public  clustered  outside.

10  Apparently, some of these citizens are claimed to have breached an

11  established police line despite FBI agents' orders to the contrary.

12  Eventually,  an  FBI  agent  used  pepper  spray  to  drive  the  surging

13  public back behind what they understood was the police line.

14      Plaintiff  began  an  investigation  into  these  events,  issuing

15  subpoenas on February 17, 2006, against García and Fraticelli for the

16  production of certain information, documents, and objects pertaining

17  to  the  FBI's  search  of  444  de  Diego.   The  subpoenas,  which

18  preemptively included an affidavit similar to the one required in the

19  context of the Ojeda information request summarizing the documents

20  requested and their relevance to the proceedings, ordered production

21  of the requested materials by February 28, 2006. The three categories

22  of requested materials were: (1)  the name, rank, division, address,

23  and telephone number of two FBI agents who allegedly used pepper

24  spray and whose photos were attached to the subpoena; (2) official

Civ. No. 06-1305 (JAF)                                           -10-

1    photographs of these two FBI agents; and (3) internal FBI protocols

2    relating to the use of force and pepper spray.

3         Facing  possible  criminal  contempt  charges  for  failing  to

4    respond, García and Fraticelli filed a motion in this court to quash

5    the subpoenas on February 28, 2006. <u>Misc. No. 06-49, Docket Document</u>

6    <u>No. 1</u>.  Plaintiff sent a letter to United States Attorney General

7    Alberto Gonzales on March 1, 2006, asking for his help in getting the

8    FBI  to  respond  to  the  subpoenas.   Plaintiff  opposed  García  and

9    Fraticelli's motion to quash the subpoenas on March 2, 2006.  <u>Misc.</u>

10   <u>No. 06-49, Docket Document No. 3</u>.   We convened a hearing that same

11   day, during which the federal government's lawyers reminded Plaintiff

12   that it had to follow DOJ regulations, which meant pursuing an agency

13   decision  through  the  proper  regulatory  framework  set  forth  in  28

14   C.F.R. §§ 16.21-16.29, in order to properly requisition the records

15   at  issue.   <u>Misc.  No.  06-49,  Docket  Document  No.  2</u>.  Plaintiff

16   indicated that it was evaluating other avenues to get information

17   about the 444 de Diego search, and that it had no serious intention

18   of enforcing the challenged subpoenas at that time. <u>Misc. No. 06-49,</u>

19   <u>Memorandum Order, Docket Document No. 4</u>.  Given this court's view

20   that Plaintiff had "effectively mooted" the issue before it by

21   disavowing an intent to enforce the subpoenas, we declined to rule on

22   Plaintiff's motion to quash. <u>Id.</u>[2]

_____

     [2]Much has been made by observers of the court process about the
fact that our Memorandum Order of March 2, 2006, <u>Misc. No. 06-049,</u>
<u>Docket  Document  No.  4</u>,  made  factual  findings  without  receiving

Civ. No. 06-1305 (JAF)                                                    -11-

1    ___The next step Plaintiff took with respect to the 444 de Diego

2    information request was to file the instant lawsuit on March 23,

3    2006, seeking declaratory and injunctive relief from Defendants'

4    failure to release the requested records.  Docket Document No. 1.

5    **C.  Cases Reassigned, Consolidated**

6    _____Plaintiff's complaint seeking Ojeda raid information was

7    originally assigned to Judge Domínguez.  Observing that it implicated

8    many of the same legal issues as Misc. No. 06-49, an action over

9    which the undersigned had retained jurisdiction, Judge Domínguez

10   reassigned the case to the undersigned on March 24, 2006.  Docket

11   Document No. 3.  That same day, and in recognition of the fact that

12   Plaintiff's complaint seeking Ojeda raid information implicated the

13   same legal issues as Plaintiff's complaint seeking 444 de Diego

14   information, the undersigned consolidated those two actions into one.

15   Docket Document No. 6.

16       Defendants moved to dismiss this case in its entirety on May 23,

17   2006.  Docket Document Nos. 23, 25.  Plaintiff opposed the motion on

18   June 7, 2006, Docket Document No. 29, and filed a motion for summary

19   judgment that same day.  Docket Document No. 30. Defendants opposed

20   Plaintiff's summary judgment motion on June 20, 2006, Docket Document

_____

evidence.  However, it is evident that that is not the case.  Our
factual narrative, like that in the present case, is open to precise
substantiation if and when any of these controversies reach a trial
on the merits.  Ascribing any purpose to those narratives other than
a simple informative background is totally misplaced.

Civ. No. 06-1305 (JAF)                                    -12-

1   No. 32, and replied to Plaintiff's opposition to their motion to

2   dismiss on June 28, 2006.   Docket Document No. 35.

                                III.

                              **Standards**

5   **A.   Motion to Dismiss Standard**

6        Under Federal Rule of Civil Procedure 12(b)(6), a defendant may

7   move to dismiss an action against him based solely on the pleadings

8   for the plaintiff's "failure to state a claim upon which relief can

9   be granted."   FED. R. CIV. P. 12(b)(6).   In assessing a motion to

10  dismiss, "we accept as true the factual averments of the complaint

11  and draw all reasonable inferences therefrom in the plaintiffs'

12  favor."   Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d

13  61, 62 (1st Cir. 2004) (citing LaChapelle v. Berkshire Life Ins. Co.,

14  142 F.3d 507, 508 (1st Cir. 1998)); see also Wash. Legal Found. v.

15  Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993).   We then

16  determine whether the plaintiff has stated a claim under which relief

17  can be granted.

18       We note that a plaintiff must only satisfy the simple pleading

19  requirements of Federal Rule of Civil Procedure 8(a) in order to

20  survive a motion to dismiss.   Swierkiewicz v. Sorema N.A., 534 U.S.

21  506 (2002); Morales-Villalobos v. García-Llorens, 316 F.3d 51, 52-53

22  (1st Cir. 2003); DM Research, Inc. v. Coll. of Am. Pathologists, 170

23  F.3d 53, 55-56 (1st Cir. 1999).   A plaintiff need only set forth "a

24  short and plain statement of the claim showing that the pleader is

Civ. No. 06-1305 (JAF)                                            -13-

1    entitled to relief," FED.R.CIV.P. 8(a)(2), and need only give the

2    respondent fair notice of the nature of the claim and petitioner's

3    basis for it. Swierkiewicz, 534 U.S. at 512-515. "Given the Federal

4    Rules' simplified standard for pleading, '[a] court may dismiss a

5    complaint only if it is clear that no relief could be granted under

6    any set of facts that could be proved consistent with the

7    allegations.'" Id. at 514 (quoting Hishon v. King & Spalding, 467

8    U.S. 69, 73 (1984)).

9    **B.    Summary Judgment Standard**

10        The standard for summary judgment is straightforward and

11   well-established.  A district court should grant a motion for summary

12   judgment "if the pleadings, depositions, answers to interrogatories,

13   and admissions on file, together with the affidavits, if any, show

14   that there is no genuine issue as to any material fact and that the

15   moving party is entitled to a judgment as a matter of law." FED. R.

16   CIV. P. 56(c).  A factual dispute is "genuine" if it could be resolved

17   in favor of either party, and "material" if it potentially affects

18   the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355

19   F.3d 6, 19 (1st Cir. 2004).

20        The moving party carries the burden of establishing that there

21   is no genuine issue as to any material fact, though the burden "may

22   be discharged by 'showing'–that is, pointing out to the district

23   court–that there is an absence of evidence to support the nonmoving

24   party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Civ. No. 06-1305 (JAF)                                           -14-

1    The burden has two components: (1) an initial burden of production

2    that shifts to the nonmoving party if satisfied by the moving party;

3    and (2) an ultimate burden of persuasion that always remains on the

4    moving party.  Id. at 331.

5         The non-moving party "may not rest upon the mere allegations or

6    denials of the adverse party's pleading, but . . . must set forth

7    specific facts showing that there is a genuine issue for trial." Fᴇᴅ.

8    R. Cɪv. P. 56(e).  Summary judgment exists "to pierce the boilerplate

9    of the pleadings and assess the proof in order to determine the need

10   for trial."  Euromodas, Inc. v. Zanella, 368 F.3d 11, 17 (1st Cir.

11   2004) (citing Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794

12   (1st Cir. 1992)).

13                                **IV.**

14                          **Legal Analysis**

15        Defendants have refused to produce the documents Plaintiff

16   requested pursuant to the housekeeping statute and the DOJ's Touhy

17   regulations.  Plaintiff's complaint challenging Defendants' decision

18   alleges five causes of action, Docket Document No. 1, and we shall

19   analyze each of these in turn.

20   **A.   Do the Housekeeping Statute or the Touhy Regulations Create**
21        **a Substantive Privilege to Protect DOJ Information?**

22        Plaintiff's first and second causes of action claim entitlement

23   to declaratory and injunctive relief ordering Defendants to produce

24   all requested information, objects, and documents ("information").

1    First, Plaintiff argues that the housekeeping statute, 5 U.S.C.

2    § 301, does not create or authorize DOJ to create through

3    regulations, any independent privileges that could preclude

4    disclosure of agency records. Docket Document No. 1. Alternatively,

5    Plaintiff argues that, even if it were legitimate for Defendants to

6    invoke such a privilege to protect agency records generally, the

7    DOJ's Touhy regulations, 28 C.F.R. §§ 16.21-16.29, explicitly bar

8    Defendants from applying the privilege to a request for DOJ records

9    made by Commonwealth law enforcement officials.  Id.

10   According to the Supreme Court, housekeeping statutes have

11   enjoyed a "long and relatively uncontroversial history" of

12   "grant[ing] authority to the agency to regulate its own affairs."

13   Chrysler Corp. v. Brown, 441 U.S. 281, 309 (1979).  Indeed, their

14   roots "go back to the beginning of the Republic, when statutes were

15   enacted to give heads of early Government departments authority to

16   govern internal department affairs." Id.; see also Act of July 27,

17   1789, ch.4 1 Stat. 29 (Department of Foreign Affairs); Act of August.

18   7, 1789, ch. 7, 1 Stat. 50 (Department of War)("[T]he Secretary for

19   the department. . . shall. . . be entitled to have the custody and

20   charge of all records, books and papers. . .). The modern-day

21   housekeeping statute – the statute at issue in this case – was last

22   amended in 1958, and provides that:

23             [t]he head of an Executive department. . . may
24             prescribe regulations for the government of his
25             department, the conduct of his employees, the
26             distribution and performance of its business,

Civ. No. 06-1305 (JAF)                                          -16-

1          and the custody, use, and preservation of its
2          records, papers, and property. . . .

3    5 U.S.C. § 301.

4         The DOJ, in accordance with its authority to manage its own

5    records, has promulgated regulations outlining the procedure that

6    must be followed when the agency or one of its employees receives a

7    subpoena for the "production or disclosure" of DOJ records. 28 C.F.R.

8    § 16.21(a)("This subpart sets forth procedures to be followed with

9    respect to the production or disclosure of any material contained in

10   the files of the Department. . . [i]n all federal and state

11   proceedings in which the United States is not a party. . . when a

12   subpoena. . . is issued for such material. . ."). The DOJ regulations

13   are commonly known as <u>Touhy</u> regulations after the 1951 Supreme Court

14   case with the same name. In that case, <u>United States ex rel. v.</u>

15   <u>Touhy</u>, a habeas petitioner subpoenaed FBI records pertaining to his

16   conviction. 340 U.S. 462, 463-64 (1951).  The Attorney General,

17   acting pursuant to agency regulations placing such decision-making in

18   his hands ("<u>Touhy</u> regulations"), ordered his subordinates not to

19   respond to the subpoena.  <u>Id.</u> at 464.  The Supreme Court held that an

20   FBI agent refusing to answer a subpoena under such circumstances

21   could not be found guilty of contempt. <u>Id.</u> at 468.  According to the

22   Court, the Attorney General, as the centralized DOJ decision-maker

23   for such information demands, could "validly withdraw from his

24   subordinates the power to release department papers." <u>Id.</u> at 467.

1    The _Touhy_ Court further commented on the wisdom of regulations

2    placing such agency determinations in the hands of one single person:

3    "When one considers the variety of information contained in the files

4    of any government department and the possibilities of harm from

5    unrestricted disclosure in court, the usefulness, indeed the

6    necessity, of centralizing determination as to whether a subpoena

7    duces tecum will be willingly obeyed or challenged is obvious." _Id._

8    at 468.

9        The DOJ's _Touhy_ regulations hold that no agency employee "shall,

10   in response to a demand, produce any material contained in the files

11   of the Department." 28 C.F.R. § 16.22(a).  Instead, the employee

12   "shall immediately notify the U.S. Attorney for the district where

13   the issuing authority is located." 28 C.F.R. § 16.22(b).  When the

14   subpoena seeks information other than oral testimony, the responding

15   U.S. Attorney, in turn, "shall request a summary of the information

16   sought and its relevance to the proceeding." 28 C.F.R. § 16.22(c).

17       The responding U.S. Attorney must then determine whether to

18   release the requested records and may be required to collaborate in

19   this regard with the custodian of the records at issue. 28 C.F.R.

20   §§ 16.24(a), (b)(1), (d)(1), (f). Among the factors the U.S. Attorney

21   must consider in deciding whether to make disclosures pursuant to a

22   request is "[w]hether disclosure is appropriate under the relevant

23   substantive law concerning privilege." 28 C.F.R. § 16.26(a)(2).  The

24   _Touhy_ regulations further explain that "[a]mong the demands in

1    response to which disclosure will not be made are those demands with

2    respect to which . . . [d]isclosure would reveal investigatory

3    records compiled for law enforcement purposes, and would interfere

4    with enforcement proceedings or disclose investigative techniques and

5    procedures the effectiveness of which would thereby be impaired." 28

6    C.F.R. § 16.26(b)(5).  Plaintiff argues that _Touhy_'s mention of this

7    investigative technique privilege is improper, and that by extension,

8    Defendants' invocation of the investigative technique privilege to

9    protect DOJ records is, therefore, also improper.  _Docket Document_

10   _Nos. 1, 11, 29_.

11       Plaintiff is correct insofar as it means to say that DOJ _Touhy_

12   regulations do not themselves create privileges to protect

13   information.  In fact, in 1958, Congress amended 5 U.S.C. § 301 to

14   explicitly emphasize that nothing in the statute itself, and,

15   therefore, nothing in the _Touhy_ regulations promulgated thereunder,

16   may "authorize withholding information from the public or limiting

17   the availability of records to the public."  5 U.S.C. § 301; _See_ _also_

18   _Chrysler Corp. v. Brown_, 441 U.S. 281, 310(1979)(emphasizing that

19   § 301 "is a 'housekeeping statute,' authorizing rules of agency

20   organization, procedure, or practice, as opposed to 'substantive

21   rules'"); _Kwan Fai Mak v. FBI_, 252 F.3d 1089, 1092 (9th Cir.

22   2001)("[T]he regulations do not create an independent privilege

23   authorizing the Department of Justice to withhold information. Nor

24   could they, because the statutory authority for them, 5 U.S.C. § 301,

1   makes clear [that they may not].")(quotations omitted); Exxon

2   Shipping Co. v. United States, 34 F.3d 774, 776 (9th Cir.

3   1994)("Section 301 does not, by its own force, authorize federal

4   agency heads to withhold evidence sought under a valid federal

5   subpoena.").

6       However, even though the housekeeping statute and the Touhy

7   regulations do not themselves create substantive privileges, the

8   federal government can invoke substantive privileges existing

9   independently of those laws to protect information demanded through

10  the Touhy process.  See United States ex rel. Touhy v. Ragen, 340

11  U.S. 462, 473 (1951)(J. Frankfurter, concurring)(noting, even though

12  the issue was not before the Court, that "[i]t will of course be open

13  to [the Attorney General] to raise those issues of privilege from

14  testimonial compulsion"); Exxon Shipping Co., 34 F.3d at 780

15  (recognizing that the federal government is "free to raise any

16  possible claims of privilege from testimonial compulsion that may

17  rightly be available to it"). As discussed, the DOJ's Touhy

18  regulations permit the U.S. Attorney to consider "[w]hether

19  disclosure is appropriate under the relevant substantive law

20  concerning privilege," 28 C.F.R. § 16.26(a)(2), and specifically

21  mention that certain records may be sensitive because their

22  disclosure may "interfere with enforcement proceedings or disclose

23  investigative techniques and procedures the effectiveness of which

24  would thereby be impaired." 28 C.F.R. § 16.26(b)(5).  The mention of

1    substantive  privilege  in  the  _Touhy_  regulations,  then,  does  not

2    constitute  regulatory  creation  of  those  substantive  privileges,  but

3    rather regulatory recognition of their existence. We must, therefore,

4    dismiss Plaintiff's claim that they are entitled to declaratory and

5    injunctive relief in this case because of Plaintiff's belief that the

6    housekeeping statute and the DOJ's _Touhy_ regulations impermissibly

7    create a privilege for Defendants to invoke to protect the requested

8    records from disclosure.

9         Plaintiff  alternatively  argues  that  even  if  we  find  that

10   privileges  exist  to  protect  agency  records  requested  through  the

11   _Touhy_ process generally, _Touhy_ regulations explicitly bar Defendants

12   from  invoking  such  privileges  against  information  requests  made  by

13   Commonwealth  of  Puerto  Rico  law  enforcement.   In  support  of  this

14   argument, Plaintiff cites a DOJ _Touhy_ regulation that reads: "Nothing

15   in this subpart is intended to impede the appropriate disclosure, in

16   the absence of a demand, of information by Department law enforcement

17   agencies  to  federal,  state,  local  and  foreign  law  enforcement,

18   prospective, or regulatory agencies."  28 C.F.R. 16.21(c).

19        There is a dearth of case law interpreting 28 C.F.R. § 16.21(c).

20   It  appears,  however,  that  Plaintiff  fails  to  state  a  claim  for

21   declaratory  or  injunctive  relief  thereunder  because  §  16.21(c)'s

22   plain language does not establish what Plaintiff purports it does,

23   i.e., a categorical rule that the DOJ can never withhold information

24   from a state law enforcement agency.  Section 16.21(c) states that

1    the DOJ's Touhy regulations are not meant to impede the "appropriate

2    disclosure" of agency records requested by federal, state, local, or

3    foreign law enforcement agencies.  If § 16.21(c)'s use of the word

4    "appropriate" is to have any meaning – and we think that it must –

5    then there must be instances where the DOJ's information disclosure

6    to a fellow law enforcement agency would be appropriate as well as

7    instances where the DOJ's information disclosure to a fellow law

8    enforcement agency would be inappropriate.  Thus, we find that

9    Plaintiff has failed to establish valid claims for either of its

10   first two causes of action.

11   **B.   Does the Invocation of Privilege Under the Housekeeping Statute**

12   **or the Touhy Regulations Unconstitutionally Abrogate Plaintiff's**

13   **Sovereign Right to Enforce its Criminal Laws?**

14        Plaintiff's third cause of action alleges that Defendants'

15   invocation of a substantive privilege to protect its records from

16   disclosure constitutes an unconstitutional abrogation of Puerto

17   Rico's sovereign right to enforce its criminal law.  Docket Document

18   No. 1.   It is well established that "[f]oremost among the

19   prerogatives of [State] sovereignty is the power to create and

20   enforce a criminal code."  Heath v. Alabama, 474 U.S. 82, 93 (1985).

21   This authority even extends to federal agents who have committed

22   criminal acts in circumstances where they are not protected by

23   qualified immunity.  See United States ex rel. Drury v. Lewis, 200

24   U.S. 1, 7 (1906)(holding that state could prosecute soldiers for

25   murder when they allegedly unlawfully shot a suspect after he had

Civ. No. 06-1305 (JAF)                                              -22-

1    surrendered); <u>but</u> <u>c.f.</u> <u>Cunningham v. Neagle</u>, 135 U.S. 1 (1890)

2    (holding that a federal law enforcement agent enjoys Supremacy Clause

3    immunity from state criminal prosecution when his violation of state

4    law arises from reasonable execution of his official duties).  There

5    is, therefore, no question that Plaintiff is within its rights to

6    criminally investigate a federal agent that it reasonably suspects

7    may have committed a crime while acting outside the scope of his or

8    her official duties.  The subpoenas at issue in this case are

9    allegedly incident to such an investigation, and we have no doubt

10   that Defendants' refusal to comply with the subpoenas makes that

11   investigation more complicated.

12        Citing this complication, Plaintiff argues that Defendants'

13   refusal to produce the requested documents in this case, made

14   pursuant to the housekeeping statute and the <u>Touhy</u> regulations,

15   unconstitutionally infringes upon Plaintiff's sovereign right to

16   enforce its criminal laws.  In support of its position, Plaintiff

17   cites case law evincing two strands of Supreme Court doctrine

18   regarding the balance of federal and state sovereignty.  <u>Docket</u>

19   <u>Document No. 11, 29</u>.  The Court's holding in <u>United States v.</u>

20   <u>Morrison</u>, for instance, supports a check on Congress when it attempts

21   to claim powers specifically denied to it by the framers, such as a

22   general police power superceding that of the states.  529 U.S. 598

23   (2000) ("The Constitution requires a distinction between what is

24   truly national and what is truly local.").  The Court's holding in

1    New York v. United States, on the other hand, delimits the federal

2    government's ability to forcibly commandeer state resources to

3    achieve federal aims.  505 U.S. 144 (1992).

4        In Morrison, the Supreme Court invalidated a provision of the

5    federal Violence Against Women Act (VAWA) establishing a civil remedy

6    for victims of gender-motivated violence.   529 U.S. 598 (2000).

7    Observing how attenuated gender-motivated violence's impact is on

8    interstate commerce, the Court concluded that the VAWA provision is

9    not a justifiable exercise of Congress' legislative authority under

10   the Commerce Clause.  Id. at 614-19.  To rule otherwise, according to

11   the Court, would be "to obliterate the Constitution's distinction

12   between national and local authority." Id. at 615.  The housekeeping

13   statute and the Touhy regulations, however, do not present the same

14   risk. Instead, they set forth a procedural framework by which the

15   federal government responds to information demands submitted to it by

16   any interested party.  We recognize that the federal government's

17   claim of privilege in this case is frustrating for Plaintiff, but we

18   simply  do  not  see  how  it  unconstitutionally  intrudes  upon

19   Plaintiff's sovereign right to conduct criminal investigations.  To

20   be  sure,  it  may  make  Plaintiff's  criminal  investigation  more

21   difficult than it might otherwise be, but the same may be said of

22   other testimonial privileges recognized by the law.

23        Plaintiff also cites to New York v. United States, a case in

24   which the Supreme Court invalidated a federal law requiring the

1    states to either regulate their radioactive waste disposal or take

2    title to it.  505 U.S. 144 (1992).  Based on an analysis of the

3    federalist principles embodied in Article I and the Tenth Amendment

4    of the United States Constitution, the Court held that it was

5    unconstitutional for the federal government to compel states to adopt

6    legislative programs in order to further federal interests.  Id. at

7    167-68 (explaining alternative, constitutional ways the federal

8    government could achieve the same ends, e.g., by conditioning the

9    receipt of federal funds on a state's willingness to craft desired

10   regulations).  "[T]he Act commandeers the legislative processes of

11   the States by directly compelling them to enact and enforce a federal

12   regulatory program, an outcome that has never been understood to lie

13   within the authority conferred upon Congress by the Constitution."

14   Id. at 176 (internal citations omitted).  Taking the Court's holding

15   into account, we fail to see, and Plaintiff fails to explain, how it

16   applies to Defendants' refusal to release the requested information.

17   It is unclear how Defendants' decision could run afoul of the

18   Constitution when it does not compel Plaintiff to do anything at all.

19        Having concluded that Defendants' decision not to disclose

20   agency records does not implicate Puerto Rico's sovereign right to

21   enforce its criminal laws under the United States Constitution, we

22   dismiss Plaintiff's third cause of action.

23   C.   **Does the APA Govern the Judicial Review of Defendants' Decision
24        Not to Release the Records Requested by Plaintiff?**

25   _____

We must next consider whether the APA governs judicial review of Defendants' decision not to release its records.  Plaintiff argues in its fourth cause of action that we should conduct non-statutory judicial review of Defendant's decision, and that the APA can apply only as an absolutely last resort.  Docket Document No. 1.  According to Defendants, however, their decision is subject to review only under the APA.  Docket Document No. 23.

It was established, even before the APA was passed, that sovereign immunity does not bar suits seeking non-statutory judicial review for non-monetary, specific relief against federal government officials where the officials' challenged actions are alleged to be unconstitutional or beyond their statutory authority.  Clark v. Library of Congress, 750 F.2d 89, 102 (D.C. Cir. 1984)(listing cases); see also Chamber of Commerce v. Reich,74 F.3d 1322, 1327 (D.C. Cir. 1996)(if a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action).  Plaintiff presumably prefers non-statutory judicial review based on the hope that it might offer more liberal procedural requirements than the APA, and perhaps a more liberal judicial review standard.  To proceed with an APA action in this case, for instance, Plaintiff would have to show that DOJ made a final agency decision with respect to its information requests.  5 U.S.C. § 704 ("Every agency action made reviewable by statute and every final agency

1    action. . . shall be subject to judicial review."). Defendants do,

2    in fact, contest whether Plaintiff has obtained such a final agency

3    decision with respect to one of the information requests at issue in

4    this case. Docket Document No. 29; see infra, section IV.D.

5    Moreover, a successful APA action would hinge on whether DOJ's

6    refusal to disclose the requested records was an "arbitrary and

7    capricious" decision in light of housekeeping statute and Touhy

8    regulation standards. 5 U.S.C. § 706(2)(A); see infra, section IV.D.

9    This "arbitrary and capricious" judicial review standard is extremely

10   deferential to the agency.

11        In support of its suggestion that judicial review of Defendants'

12   decision to withhold records is not governed by the APA, Plaintiff

13   refers us to Leedom v. Kyne, a Supreme Court case holding that a

14   United States District Court had general jurisdiction to hear a

15   lawsuit against the National Labor Relations Board for placing

16   professional employees into a bargaining group with non-professional

17   employees in clear violation of federal law, even though the NLRB's

18   action was not eligible for any statutory judicial review. 358 U.S.

19   184, 190 (1958). If no judicial review were available under federal

20   courts' general jurisdiction when the federal government acted to

21   deprive rights in excess of its delegated powers, the Court reasoned,

22   laws passed by Congress would be unenforceable and robbed of their

23   vitality. Id.

1        Plaintiff also invokes a similar ruling by the First Circuit in

2   Rhode Island Department of Environmental Management v. United States

3   to further justify its position that its claim need not be under the

4   APA and that it may proceed under the court's equitable powers and in

5   the general federal jurisdiction of 28 U.S.C. § 1331.  304 F.3d 31

6   (1st Cir. 2002).  In that case, a Rhode Island state agency that had

7   been haled before a federal administrative law judge (ALJ) argued

8   that sovereign immunity protected it from defending itself in that

9   federal forum.  Id. at 39 n. 2.  After the ALJ rejected the sovereign

10  immunity argument, the state agency filed a federal lawsuit seeking

11  judicial review, and the district court ruled in the state's favor.

12  Id. at 36.

13       The First Circuit, while holding that the ALJ had never made a

14  "final agency decision" reviewable by the district court under the

15  APA, endorsed the district court's non-statutory judicial review of

16  the ALJ's determination anyway, noting that the question of whether

17  the state was protected by sovereign immunity would have otherwise

18  remained ineligible for judicial review until after the ALJ entered

19  a final decision in the administrative dispute, that is to say, until

20  well after the state's sovereign interest in "prevent[ing] the

21  indignity of [being] subject[ed]. . . to the coercive process of

22  judicial tribunals" had already been compromised.  Id. at 41 (internal

23  quotations and citations omitted).

1       While Leedom and Rhode Island indeed present peculiar instances

2   where non-statutory judicial review of agency action was permitted,

3   they do not stand for the proposition that a United States District

4   Court is authorized to allow non-statutory review whenever a party

5   requests it.  Rather, non-statutory judicial review of the kind seen

6   in Leedom and Rhode Island is only available within "painstakingly

7   delineated procedural boundaries." See Boire v. Greyhound Corp., 376

8   U.S. 473, 481 (1964).  Furthermore, the Supreme Court has set forth

9   the factors that must be present to invoke non-statutory review.

10  Rhode Island, 304 F.3d at 42-43.  One factor that must be present is

11  a showing that the denial of judicial review of a non-final agency

12  decision would "wholly deprive the [party] of a meaningful and

13  adequate means of vindicating its rights." Bd. Of Governors of Fed.

14  Reserve System v. Mcorp Fin. Inc., 502 U.S. 32, 43 (1991).  It is

15  this factor that was central to the Supreme Court's decision in

16  Leedom, where the professional employees had no other recourse

17  through which to obtain judicial review, and central to the First

18  Circuit's decision in Rhode Island, where the state's sovereign

19  immunity would not survive intact if it had been forced to wait to

20  seek  judicial  intervention  until  the  federal  administrative

21  proceeding had already run its course against it.

22      By contrast, there is no indication that denial of non-statutory

23  review of Defendants' decision to withhold would deprive Plaintiff of

24  a meaningful and adequate means of vindicating its rights.  It is

1   very clear Plaintiff has a means of vindicating its rights: Through

2   the APA. Kwan Fai Mak v. FBI, 252 F.3d 1089, 1091 n.5 (9th Cir.

3   2001)("[T]he proper procedure for the party seeking to compel

4   disclosure in such circumstances is to file a separate action in

5   federal court under the APA."); COMSAT Corp. v. Nat'l Sci. Found.,

6   190 F.3d 269, 271 (4th Cir. 1999)("[W]hen the government is not a

7   party to the underlying action, an agency's refusal to comply with a

8   subpoena must be reviewed under the standards established for final

9   agency actions by the [APA]. . ."); Smith v. Cromer, 159 F.3d 875,

10  881 (4th Cir. 1998)("[The] remedy, if any, for the Justice

11  Department's [refusal to release information] in the instant case may

12  be found in the [APA]. . ."); In re Elko County Grand Jury v.

13  Siminoe, 109 F.3d 554, 557 n.1 (9th Cir. 1997)("The appropriate means

14  for challenging [a federal agency's] decision under Touhy is an

15  action under the Administrative Procedure Act in federal court.").

16  The APA expressly provides Plaintiff with a meaningful and adequate

17  opportunity for judicial review of Defendants' action.

18        In addition, we disagree with Plaintiff's final argument

19  regarding the inapplicability of the APA to the present case.

20  Plaintiff cites to a footnote in Exxon Shipping Co. v. United States

21  Department of Interior, which states that, in some instances, "APA

22  proceedings can be costly, time-consuming, inconvenient to litigants,

23  and may effectively eviscerate any right to the requested testimony."

24  34 F.3d 774, 780 n.11 (9th Cir. 1994) (internal quotations omitted)

1   (citing to <u>In re Recalcitrant Witness</u>, 25 F.3d 761 (9th Cir. 1994)).

2   This argument is misplaced.    The <u>Exxon Shipping Co.</u> footnote

3   contemplates the potential inadequacy of the APA only in a limited

4   circumstance; namely, when a plaintiff's access to a government

5   witness' testimony would be precluded if forced to wait for an APA

6   action to ripen.   This narrow exception to the general rule that the

7   APA governs review of all agency action does not apply to the case at

8   hand. We, therefore, dismiss Plaintiff's fourth cause of action

9   requesting non-statutory judicial review of Defendants' decision not

10   to release the agency records requested in this case.

11   **D.**   **Is Defendants' Decision Not to Release the Requested Records**
12        **"Arbitrary and Capricious" Under the APA?**

13        The Administrative Procedure Act, which was first passed in

14   1946, sets forth rules by which agencies exercising congressionally

15   delegated executive, legislative, and judicial powers execute those

16   functions.   <u>See</u> Steven P. Croley, The Administrative Procedure Act

17   and Regulatory Reform: A Reconciliation, 10 Admin. L.J. Am. U. 35, 36

18   (1996).   It also grants individuals the right to judicial review of

19   agency action.   5 U.S.C. § 702.   The original text of § 702 of the

20   APA, the provision granting individuals the right to judicial review

21   of agency action, provided that "[a] person suffering legal wrong

22   because of agency action, or adversely affected or aggrieved by

23   agency action within the meaning of a relevant statute, is entitled

24   to judicial review thereof."     S.Rep. No. 94-996, pp. 19-20

1    (1976)(S.Rep.).  A 1976 amendment to that law added language stating

2    that "[a]n action in a court of the United States seeking relief

3    other than money damages and stating a claim that an agency or an

4    officer or employee thereof acted or failed to act in an official

5    capacity or under color of legal authority shall not be dismissed nor

6    relief therein denied on the ground that it is against the United

7    States. . ." 5 U.S.C. § 702. (1996 & Supp. 2006).  As amended, then,

8    § 702 waives the federal government's sovereign immunity defense with

9    regard to lawsuits seeking non-monetary relief for improper Federal

10   administrative action. Clark v. Library of Congress, 750 F.2d 89, 102

11   (D.C. Cir. 1984); see also David A. Webster, Beyond Sovereign

12   Immunity: 5 U.S.C. § 702 Spells Relief, 49 Ohio St. L.J. 725, 726

13   (1988) (discussing how courts have interpreted what constitutes a

14   "non-monetary relief" lawsuit under § 702).

15       The scope of judicial review for agency action is set forth by

16   § 706 of the APA, which states that the reviewing court may reverse

17   an agency's action only if it was "arbitrary, capricious, an abuse of

18   discretion, or otherwise not in accordance with the law."[3]    5 U.S.C.

---

[3]Even if we were to determine that Defendants arbitrarily or
capriciously misapplied DOJ's Touhy regulations, however, we are not
entirely sure that the APA empowers us to compel release of the
requested information in the present case, for the Touhy regulations
make clear that they "are intended only to provide guidance for the
internal operations of the Department of Justice, and [are] not
intended to, and [do] not, and may not be relied upon to create any
right or benefit, substantive or procedural, enforceable at law by a
party against the United States."  28 C.F.R. § 16.21(d); Compare
Smith v. Cromer, 159 F.3d 875, 880 (4th Cir. 1998)("It is. . .
incorrect to conclude that the Justice Department regulations, if

Civ. No. 06-1305 (JAF)                                              -32-

1    § 706(2)(A)(1996 & Supp. 2006).  Judicial review is accordingly

2    "severely limited," and courts are only free to determine whether the

3    agency followed its own guidelines or committed a clear error of

4    judgment."  <u>Davis Enter. v. EPA</u>, 877 F.2d 1181, 1186 (3d Cir. 1989).

5    We may not substitute our own judgment for that of an agency.  <u>Id.</u> at

6    1186.

7        A plaintiff may not seek substantive judicial review of an

8    agency's decision until the contested agency decision is "final."  5

9    U.S.C. § 704 ("Every agency action made reviewable by statute and

10   every final agency action. . . shall be subject to judicial

11   review.").  The Supreme Court has held that an agency action is

12   considered "final" only when the action signals the consummation of

13   the agency's decisionmaking process and gives rise to legal

14   consequences.  <u>See</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 156 (1997).

15   Although Defendants concede that Plaintiff has secured a final

16   decision with respect to its Ojeda information requests, Defendants

17   argue that Plaintiff has not secured a final decision with respect to

18   its 444 de Diego information request and, therefore, the Plaintiff's

19   claim regarding the 444 de Diego request must be dismissed.  <u>Docket

20   Document No. 23</u>.

_____

properly 'complied' with, confer some entitlement on parties seeking
the disclosure of agency records.  The regulations do not purport to
grant any right of access to applications."), <u>with</u> <u>Kasi v. Angelone</u>,
300 F.3d 487, 506 (4th Cir. 2002)(stating that a district court may,
under the APA, "compel the law enforcement agency to produce the
requested information in appropriate cases").

Civ. No. 06-1305 (JAF)                                                    -33-

1        In fact, Plaintiff has not submitted anything into the record

2   indicating that the government made a final decision on its demand

3   with regard to its 444 de Diego requests.   This is a bizarre

4   procedural omission on Plaintiff's part, given that it was publicly

5   advised during our March 2, 2006, hearing that it must follow the

6   Touhy process in order to achieve a final agency decision.   Misc.

7   No. 06-49, Docket Document No. 7.   Moreover, Plaintiff was obviously

8   fully aware of this requirement from its experience making its Ojeda

9   information requests.   Rather than cure its procedural deficiencies,

10  Plaintiff instead chose to simply file this lawsuit three weeks later

11  demanding access to the 444 de Diego records.   Thus, because

12  Plaintiff has failed to secure a final decision regarding the 444 de

13  Diego information requests, we cannot move to the substantive merits

14  of the government's withholding.

15       Plaintiff tries to wave away the procedural shortcomings of its

16  444 de Diego information requests in its summary judgment motion by

17  pointing to a letter it received from the FBI's General Counsel,

18  Valerie Caproni, on April 7, 2006, stating that "all matters

19  pertaining to [the 444 de Diego information request] will be resolved

20  by the District Court. It is the opinion of this office that no

21  further action should be taken by the FBI pending such resolution."

22  Docket Document No. 30, Exh. 2.   Plaintiff argues that this letter

23  constitutes final agency action and that the substantive merits of

24  Defendants' refusal to release 444 de Diego information is,

1    therefore, subject to judicial review under the APA.   Plaintiff's

2    invocation of Caproni's April 7, 2006, letter as a final agency

3    decision reviewable under the APA is unacceptable, however, for

4    Plaintiff filed its complaint against Defendants on March 23, 2006 –

5    approximately two weeks before the Caproni letter was written.

6    Ultimately, then, we find that Plaintiff's claim under the APA that

7    the government improperly withheld the 444 de Diego information

8    fails. ___

9        We now move to the last issue in this litigation, which is

10   whether Defendants' decision to invoke the law enforcement

11   investigatory techniques privilege against the disclosure of all

12   requested Ojeda records was arbitrary.[4]   Docket Document No. 25.

13   Defendants claim that the investigatory techniques privilege is the

14   basis for withholding all requested Ojeda records.   Docket Document

15   No. 25.   As discussed, Defendants concede that their refusal to

16   release the Ojeda records is a final agency decision, and reviewing

17   courts may reverse final agency decisions if they are "arbitrary,

18   capricious, an abuse of discretion, or otherwise not in accordance

19   with the law."   5 U.S.C. 706.

---

[4]Defendants originally also invoked a privilege protecting law
enforcement investigatory files from release when they could reveal
sensitive information relating to an ongoing government
investigation. Docket Document No. 25.   On September 6, 2006, after
the DOJ's Office of the Inspector General completed its investigation
and issued an extensive report regarding the FBI operation to arrest
Ojeda, Defendants indicated to this court that they would thereafter
exclusively rely on the law enforcement privilege to protect the
requested DOJ records from release.   Docket Document No. 38.

1    The investigatory techniques privilege is "based primarily on

2  the harm to law enforcement efforts which might arise from public

3  disclosure of . . . investigatory files." United States v. Winner,

4  641 F.2d 825, 831 (10th Cir. 1981)(discussing how the Deputy Attorney

5  General may invoke the law enforcement privilege to protect DOJ

6  records from release in the context of a Touhy demand)(citing Black

7  v. Sheraton Corp., 564 F.2d 531 (D.C. Cir. 1977)).

8    Defendants assert that the release of the Ojeda records that

9  Plaintiff requested "would [reveal], inter alia, how the FBI goes

10  about capturing a fugitive who is believed to be dangerous, the

11  number and types of personnel used by the FBI in such operations, the

12  way the FBI collects evidence, the FBI's internal operating

13  procedures in a variety of law enforcement settings, and the way in

14  which law enforcement information is gathered." Docket Document

15  No. 25. The records Plaintiff requested include the "operation

16  order" relating to the attempt to apprehend Ojeda; detailed

17  information about every person involved in the operation (including

18  name, rank, and division); lists compiled during the operation; FBI

19  organizational charts; and multiple internal protocols. It is easy

20  to see from the nature of these records that they would reveal what

21  Defendants claim they would reveal. We cannot, therefore, say that

22  Defendants' strong interest in ensuring that such revealing

23  information regarding sensitive investigative techniques remain

24  confidential is arbitrary or capricious.

1      Pinpointing the government's strong interest in nondisclosure is

2 only the first part of our review.   The investigative techniques

3 privilege is qualified in that the government's interest in

4 nondisclosure must outweigh Plaintiff's need for access to the Ojeda

5 information.  Black v. Sheraton Corp. of America, 564 F.2d 531, 545

6 (D.C. Cir. 1977); United States v. Lilly, 185 F.R.D. 113, 115 (D.

7 Mass 1999)(citing Cintolo, 818 F.2d at 1002).   Plaintiff's interest

8 in the Ojeda records stems from its need for evidence to conduct a

9 local investigation into whether federal agents are subject to

10 criminal prosecution for their actions during the September 28, 2006,

11 FBI raid during which Ojeda was shot and killed.   Docket Document

12 No. 28.  Defendants, however, aver that Plaintiff's interest in this

13 regard has been greatly diluted by the fact that Plaintiff has

14 presented no basis for believing that the incidents here fall into

15 the rare class of cases where a state may prosecute a federal

16 officer.  Docket Document No. 32.   Indeed, the DOJ's Office of the

17 Inspector General has already conducted an extensive investigation

18 into the federal agents' actions during the raid and published a 237-

19 page report, available for public consumption, extensively detailing

20 how the federal agents involved in the Ojeda raid acted within their

21 authority and responsibility. See U.S. DOJ, Office of the Inspector

22 General, A Review of the September 2005 Shooting Incident Involving

23 the FBI and Filiberto Ojeda Ríos, August. 6, 2006, Available at:

24 http://www.usdoj.gov/oig/special/s0608/full_report.pdf. We find that

1  Defendants have not made a "clear error in judgment" by invoking the

2  investigatory techniques privilege.  <u>Davis</u>, 877 F.2d at 1186.  Given

3  that an extensive governmental investigation has already taken place

4  reviewing and ultimately certifying the propriety of the federal

5  agents' actions during the raid,[5] we cannot say that Defendants have

6  arbitrarily discounted Plaintiff's need to access the Ojeda records

7  and conduct yet another investigation.  Thus, we conclude that the

8  government's interest in protecting its investigative techniques is

9  paramount in this case.  Indeed, the First Circuit has cautioned that

10  where investigative techniques may be revealed, "the potential price

11  to be paid by law enforcement is heavy, and should not be assessed

12  without good reason."  <u>United States v. Cintolo</u>, 818 F.2d 980, 1002

13  (1st Cir. 1987).

14      Moreover, we are certain that today's result reaches the correct

15  decision not only because compelled disclosure of Defendants' Ojeda

16  records is not required under the law, but also because Defendants

17  have shown themselves to be extremely reasonable in negotiating with

18  Plaintiff to grant it as much access to the requested information as

19  possible without compromising the government's interest in protecting

20  its sensitive investigative techniques.  Defendants have, for

21  instance, granted Plaintiff substantial access to some of the

22  requested information – the bullet proof vests and helmets damaged

_____

[5]Prompted in part by a request by Puerto Rico Governor Aníbal
Acevedo Vilá. <u>Docket Document No. 1, Exh. A.</u>

1   during the intervention, the weapons fired in the intervention, the

2   vehicle used to enter Ojeda's residence, and the photographs taken

3   before, during, and after the intervention – so long as Plaintiff's

4   agents did not assume physical custody of the information, and so

5   long as federal agents were present with Plaintiff's agents as they

6   studied the information.  Civ. No. 06-1306, Docket Document No. 1,

7   Exh. L.  This, we think, shows that Defendants have not unthinkingly,

8   unyieldingly, or arbitrarily rejected Plaintiff's request for the

9   records at issue but, rather, have made a measured effort to share as

10  much information as possible with a state law enforcement agency

11  without compromising the effectiveness of their techniques.

12      Plaintiff    complains    that    Defendants    have    waived    the

13  investigative technique privilege and are, therefore, foreclosed from

14  invoking it to protect the Ojeda information for the first time in

15  the context of this litigation.  Docket Document No. 29.  We need not

16  delve too deeply into this allegation, for it is simply not true.

17  The case record contains letters from García, which were submitted to

18  this court as attachments to Plaintiff's own complaint, repeatedly

19  invoking the investigative technique privilege relied upon by the

20  government in this case.  See Civ. No. 06-1306, Docket Document

21  No. 1, Exhs. E, G.

22      Plaintiff also argues that the investigatory technique privilege

23  only exists to protect government information from criminals who

24  might frustrate future government surveillance.  Docket Document

1    No. 29.  Such concern, according to Plaintiff, is inapplicable in the

2    present case given that it is a "sister law enforcement agency," and

3    not a criminal.  We think that Plaintiff's argument misapprehends

4    that the investigative technique privilege does not only operate to

5    prevent the release of sensitive agency records directly into the

6    hands of a criminal, but also prevents any unrestricted dissemination

7    of sensitive agency records to any person or entity in order to best

8    protect the integrity and effectiveness of the agency's investigative

9    practices.  Indeed, Defendants have noted Puerto Rico officials'

10   marked eagerness to talk to the press about the progress of its

11   controversial information requests.  Civ. No. 06-1306, Docket

12   Document No. 1, Ex. K.  Defendants' hesitance to release sensitive

13   records to Plaintiff is therefore well-founded, and we certainly

14   cannot find it arbitrary.

15        Given our determination that Defendants have validly claimed the

16   investigative techniques privilege to protect the Ojeda records in

17   this case, we must deny Plaintiff's motion for summary judgment in

18   its favor and grant summary judgment for Defendants.  Although

19   Defendants have not moved for summary judgment, we find it

20   appropriate to grant relief to a nonmovant. See Nat'l Expositions,

21   Inc. v. Crowley Maritime Corp., 824 F.2d 131, 133 (1st Cir.

22   1987)("[A] district court has the legal power to render summary

23   judgment . . . in favor of the party opposing a summary judgment

24   motion even though he  has made no formal cross-motion under rule

Civ. No. 06-1305 (JAF)                                                -40-

1    56."); 11 Moore's Federal Practice § 56.10[2][b] (Matthew Bender 3d

2    ed.).   Plaintiff's own position is that there is no genuine issue of

3    material fact as to this issue, and Plaintiff had adequate

4    opportunity to present related evidence in the context of its own

5    summary judgment motion.   With this dismissal of the balance of

6    Plaintiff's fifth cause of action, no causes of action remain against

7    the Defendants, and Plaintiff's complaint has been dismissed in its

8    entirety.

9                                    **V.**

10                                **Conclusion**

11       For the reasons stated herein, we **GRANT** Defendants' motion to

12   dismiss as to Plaintiff's first four causes of action, **DENY**

13   Plaintiff's summary judgment motion as to the fifth, and, instead

14   **GRANT** summary judgment to Defendants regarding Plaintiff's fifth

15   cause of action.   Judgment shall be entered accordingly.

16       **IT IS SO ORDERED.**

17       San Juan, Puerto Rico, this 26th day of September, 2006.

18                                    s/José Antonio Fusté
19                                    JOSE ANTONIO FUSTE
20                                    Chief U. S. District Judge